

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

DEC 20 2007

JAMES N. HATTEN, CLERK
By: [signature] Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **KRYSTAL M. MOORE,** | : |
| Plaintiff, | : |
| v. | : CIVIL ACTION FILE |
| | : NO. 1:07-CV-0972 |
| **TURNER BROADCASTING SYSTEM, INC.,** | : |
| **TURNER SERVICES, INC.,** | : |
| And **JUAN A. MAITLAND** | : |
| Defendants. | : |

## AFFIDAVIT OF BRADFORD PILCHER

PERSONALLY APPEARED before the undersigned officer duly authorized to administer oaths, BRADFORD PILCHER, who, being duly sworn, deposes and states on oath as follows:

**1.**

The facts stated in this Affidavit are true and correct.

**2.**

My name is Bradford Pilcher.

**3.**

I am over the age of eighteen years and am competent in all respects to testify to the matters stated herein.

**4.**

I have personal knowledge of the facts contained in this Affidavit.

**5.**

I worked alongside Krystal Moore, an employee in the TBS, Inc., Records Center of the Legal Department. My interactions with her and observations of her were a result of my job responsibilities as a member of a team headed by Lori Van Rossem that oversaw the data management systems for the Legal Department.

**6.**

I designed special projects for the Legal Records Center staff, wherein I would need to explain procedures and ensure their understanding. I was also responsible for monitoring periodically that such projects were being enacted, that no questions or confusions had arisen on the part of Legal Records Center staff, and that any additional resources were provided as necessary.

In addition, I was tasked with observing and analyzing procedures and operations of the Legal Records Center in order to improve its efficiency and eliminate any systemic problems. These responsibilities came after the departure of Chuck Blake, who oversaw the Legal Records Center. This transition was seen, by managers at Lori Van Rossem's level and above, as an opportunity to review the operations of the Legal Records Center. In the course of my observations, one area I specifically focused on was the work ethics, conformance to guidelines, and operational performance of Legal Records Center employees including Henry Wheat, Diya Roberts, and Krystal Moore.

**7.**

My cubicle and workstation was situated inside the Legal Records Center room at CNN Center. Also stationed in this room were Henry Wheat, Diya Roberts, and Krystal Moore. Juan Maitland, their supervisor, would also make routine visits to the CNN Legal Records Center, giving me an opportunity to witness the general interactions of the staff during supervised and unsupervised periods.

**8.**

In the course of these activities, I came to hold a high professional regard for Krystal Moore. In my assessment, she was routinely professional in her attire and comportment. Her intelligence was not in dispute, nor was her ability to learn new procedures quickly. She commonly performed her responsibilities well within guidelines and with an above average level of efficiency.

She was unflaggingly polite and cordial. In my observations, she got along very well with her co-workers. Despite the relatively mundane job responsibilities with which she was tasked, she never presented a negative attitude about her job, nor did her job performance decline during my time working alongside her. These traits were consistent both when she was working unsupervised as well as supervised.

In fact, my opinion at the time was that Ms. Moore was overqualified for her position and, in some cases, visibly outclassed her colleagues in the Legal Records Center. During an informal conversation about Records Center operations, I recall mentioning to Larry, Interim Director of Turner Corporate Legal Services, that Ms. Moore should be the prototype for a Legal Records Center employee.

**9.**

I worked under the supervision of Chuck Blake and Juan Maitland inside the Legal Records Center, prior to my placement with Lori Van Rossem's team. During this time, my cubicle was in the Legal Records Center room at the Techwood Campus of Turner Broadcasting System. My tenure there was prior to Krystal Moore joining the company, and it allowed me to view the interactions of Juan Maitland firsthand.

**10.**

My responsibilities required I speak with Mr. Maitland or visit his office multiple times per day. In addition to my routine responsibilities, which included file creation and retrieval as well as systems maintenance in the Legal Records Center, I was also required to assist Mr. Maitland with an ongoing special project. At this point, the Lawbase system used to digitally track the files of the Legal Department had not yet been deployed to Los Angeles or international offices. As such, all paperwork and filing generated by the legal teams in Los Angeles would be copied and sent by courier to Mr. Maitland. At the time I worked in the Legal Records Center, Mr. Maitland was tasked with integrating this paperwork into the appropriate existing files or new files as necessary.

In practice, Mr. Maitland would hand this paperwork over to me. I was then tasked with integrating the materials into new or existing files and submitting a report to Mr. Maitland for his review. He would then check to ensure I had properly filed all materials.

As I understand it, Todd Doogan, a colleague and former employee of the Legal Records Center, had previously been responsible for this specific task. When he transitioned from the Legal Records Center to the Animation group within the Legal Department, these responsibilities fell to Mr. Maitland. When Mr. Doogan discovered that I was handling this responsibility, I recall that he expressed surprise that Mr. Maitland was requiring that I do this work. I had just joined the company and lacked the experience with the existing file structure or how to properly identify how an unlabeled document should be filed.

**11.**

Over the course of my work with Mr. Maitland, it became clear to me that he routinely delegated routine responsibilities to subordinate employees and required them to submit final reports to him. I recall that he did, on at least one occasion, claim credit for a report I had submitted to him. Following that, and after leaving Techwood to take up my position at CNN Center, I made it a point not to submit reports to Mr. Maitland exclusively. Whenever he would request information or a presentation, I would inquire instead into whom the information was for and submit any final materials to them as well as Mr. Maitland.

**12.**

In my time working alongside Mr. Maitland, a more disturbing pattern of behavior was revealed to me. I recall witnessing Mr. Maitland make jokes and comments of a sexual nature in the course of his discussions with Records Center employees. These comments were made in the open, able to be heard by all occupants of the Records Center room. To be clear, the room included four separate cubicles and was often visited by Legal Department employees in the course of their work. It is difficult for me to recall specific instances or comments, but I can recall comments about female employees' cleavage as being attractive and reference to the "good view" that Mr. Maitland had of women's posteriors from his wheelchair. As a new employee, still listed as having temporary-status, I did not raise this issue with other employees initially.

**13.**

During the summer of 2004, a few months after I joined the company, I was asked to attend a training session at CNN Center. The session was to focus on some aspect of the Lawbase system, and Mr. Maitland was also planning on attending. Mr. Maitland suggested that I ride with him, as I did not yet have parking privileges at CNN Center. He indicated we would get lunch before the training session began.

Upon arriving at CNN Center, I was informed by Mr. Maitland that he had invited two women who previously worked at Turner to join us for lunch. They were employees of the Atlanta Hawks and Atlanta Thrashers, and had left Turner when these franchises were sold. We met them in the food court at CNN Center, where Juan displayed a frank and sexually flirtatious tone with both women. He commented on their outfits and physical appearances, including how it aroused him. Neither seemed visibly bothered by his behavior, but I remember it as making me very uncomfortable. In light of his status as a married man and a father of a daughter, I was personally appalled by his actions. As a subordinate, I felt

decidedly uncomfortable, though I did not speak up. I remained largely silent during the lunch.

**14.**

After the lunch, Mr. Maitland and I got into an elevator to take us to the floor where the training session was being held. As I recall this was in the South Tower of CNN Center. Unsolicited, Mr. Maitland expressed to me that he wasn't sure what it was about him that was so aroused by women, but he felt it was probably his "Latin blood." I did not respond to the statement and largely avoided speaking to him prior to and after the training session was complete.

**15.**

Upon my return to Techwood, I approached Mr. Doogan with the events and my discomfort. I remember specifically stating that I would not agree to ride to any outside event with Mr. Maitland again in the future, and that I would appreciate it if I could ride with Mr. Doogan when possible. He expressed to me that Mr. Maitland's actions were not surprising to him, and that I should document the event in some way. I may or may not have sent myself an email using the company email system, documenting the date of the event and the rough outline. I cannot recall for sure. It was also revealed to me by Mr. Doogan that Mr. Maitland had a reputation for being flirtatious with female employees.

**16.**

It was disclosed to me that Mr. Maitland had been the subject of a sexual harassment complaint previously. I believe Mr. Doogan mentioned this, but I cannot recall for sure if it was him. I was not informed of the outcome of that complaint or the name of the complainant.

**17.**

After that event, I only interacted with Mr. Maitland when necessary. My assessment was that he held a general disrespect for women, perhaps due to his cultural background, as he seemed both aware and genuinely unapologetic of his behavior. I recall being informed that some female employees in the Legal Department avoided going to the Records Center unless absolutely necessary due to their discomfort with Mr. Maitland's comments.

**18.**

I was moved to CNN Center and placed under the supervision of Mrs. Van Rossem not long thereafter. I was pointedly relieved to no longer have to work in close proximity to Mr. Maitland. This was due not only to his behavior towards female

employees and women generally, but also due to his managerial style. Mr. Maitland's style of management was in marked contrast to Mr. Blake's, with whom I enjoyed a very positive relationship. Rather than taking a positive, forward-looking approach, Mr. Maitland was often reactionary, even over-reacting to minor issues. It was not uncommon for Mr. Maitland to raise his voice or talk in a demeaning manner to subordinate employees. He did little to encourage Legal Records Center staff or create a positive working environment. Any problems were assumed to be the result of incompetence by the Legal Records Center staff, and his efforts could occasionally complicate efforts to resolve a situation.

FURTHER AFFIANT SAYETH NOT.

_____
BRADFORD PILCHER

SWORN TO AND SUBSCRIBED
Before Me This 4th Day
Of Sept., 2007.

_____
Notary Public

My Commission Expires:
10/1/2010

_____
(AFFIX NOTARIAL SEAL)